* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over this claim.
 2. Plaintiff was an employee of Defendant-Employer on August 23, 2004. *Page 2 
3. On August 23, 2004, St. Paul Travelers Insurance Company was the workers' compensation insurer of Defendant-Employer.
4. Plaintiff was injured on August 23, 2004.
5. On August 23, 2004, Plaintiff's average weekly wage was $302.75, resulting in a compensation rate of $201.84.
6. The issue to be determined is whether Plaintiff sustained a compensable injury by accident arising out of and in the course of her employment?
 * * * * * * * * * * * EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Plaintiff's medical records (supplemented by records provided with Plaintiff's counsel's letters dated 5/18/06 and 9/15/06)
 • Exhibit 3: Plaintiff's medical bills (supplemented by records provided with Plaintiff's counsel's letter dated 5/18/06)
 • Exhibit 4: Industrial Commission forms
 • Exhibit 5: Defendants' discovery responses
 • Exhibit 6: Plaintiff's tax records (provided with Plaintiff's counsel's letters dated 5/15/06, 5/18/06 and 9/14/06)
 * * * * * * * * * * *
Based upon the competent evidence of record and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 3 
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 49 years of age with a date of birth of December 27, 1956. She has a 10th grade education and has received training as a certified nursing assistant (CNA) and training in carpentry. The majority of Plaintiff's work experience over the past 21 years has been working as a CNA.
2. Plaintiff began working for Defendant-Employer as a CNA in October 2003. Plaintiff described her duties as a CNA as keeping her patients comfortable and attending to their needs. During the period that Plaintiff worked for Defendant-Employer, she worked solely for the same patient (hereinafter referred to as "the patient"). Plaintiff stated that she had worked for the patient before she came to work for Defendant-Employer. In fact, the family of the patient made arrangements with Defendant-Employer for Plaintiff to become an employee so that Plaintiff could continue providing care and serving as a CNA for the patient.
3. When Plaintiff initially began to provide services, the patient did not require a lot of assistance, but the patient's health declined over time. By August 2004, the patient required Plaintiff's assistance with movement, especially getting in and out of bed and chairs and while using a walker. The patient could use her arms and hands, but Plaintiff had to assist in getting the patient up, bathing her and fixing her meals. Once Plaintiff helped the patient get up to a standing position, the patient could balance herself. Plaintiff testified that the patient was a heavy person and family members often assisted her.
4. The patient had begun to need help getting out of bed for about a year and a half prior to August 23, 2004. Plaintiff testified that on an average day, she would arrive early in the morning to assist the patient in getting out of bed. Normally, when Plaintiff arrived at work the patient would be in the middle of her bed. Plaintiff would help the patient get out of bed by turning the patient perpendicular to the head and footboard so that her head would lie on one side *Page 4 
across the bed and her feet on the other side. Using the patient's body as a lever, Plaintiff would then angle the patient's feet to the floor while most of the patient's weight remained on the bed. Plaintiff would then push and pull with some help from the patient to get the patient up to a standing position. Plaintiff described the patient as being "stiff as an ironing board" and testified that it required a good deal of lifting and maneuvering to get her in and out of bed on a daily basis.
5. On August 23, 2004, Plaintiff felt a pop in her shoulder resulting in immediate pain as she was assisting the patient out of bed. On that day when Plaintiff arrived at work, the patient was in bed as usual, but the patient was positioned on the edge of the bed. Plaintiff testified that it was unusual for the patient to be located on the edge of the bed in the morning. Because the patient was on the edge of the bed, rather than the middle, when Plaintiff turned the patient to place her feet off the side of the bed to help her stand up, the patient began to slide down to the floor. Plaintiff testified that she had to "get a better brace on her [the patient] to make sure she don't hit that floor." Consequently, most of the patient's weight was on Plaintiff rather than the bed. Plaintiff testified that when the patient started sliding and she tried to "brace" herself and get the patient up, she felt a pop in her arm and immediate pain. Usually a family member would assist with getting the patient out of bed, but Plaintiff had also occasionally performed the task alone as she did on August 23, 2004. Plaintiff testified that she was used to sliding the patient to move her, but on this occasion, the patient was sliding down to the floor. Plaintiff informed the patient of the pop and pain in her shoulder. The patient's granddaughter then came to assist. Plaintiff remained at work after this incident until the completion of her shift. *Page 5 
6. On August 23, 2004, when the patient began to unexpectedly slide off the bed to the floor causing more of the patient's weight to have to be supported by Plaintiff, this incident constituted an interruption of Plaintiff's normal work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. Plaintiff's resulting injury to her shoulder constituted an injury by accident arising out of and in the course of her employment.
7. After Plaintiff completed her shift, she went to the Emergency Room at WakeMed Center later that evening with complaints of shoulder pain. Plaintiff reported that she injured her right shoulder as a result of lifting a heavy patient at work. She was examined and diagnosed with a partial biceps tendon tear. In addition, she was restricted from heavy lifting with her right upper extremity for the next five days.
8. Plaintiff notified the owner of Defendant-Employer, Ms. Patty Williams, within 24 hours of her injury. Plaintiff returned to work the following day. Thereafter, the patient's family assisted with lifting the patient because Plaintiff was unable to perform this job duty. The parties stipulated that Plaintiff was injured on August 23, 2004.
9. On September 2, 2004, Plaintiff was seen at Doctor's Urgent Care Centre. Plaintiff reported that she had sustained an injury to her right shoulder while moving a patient. Plaintiff was diagnosed with right arm pain and was released to return to work with the restriction of minimal use of her right arm.
10. Plaintiff returned to Doctor's Urgent Care Centre on September 8, 2004. An x-ray was performed on her right arm, which revealed no positive findings. Plaintiff was referred to an orthopedist for further evaluation and treatment.
11. Plaintiff received follow-up treatment with WakeMed Center on September 24, 2004, and December 14, 2004. Plaintiff underwent a physical therapy evaluation on December *Page 6 
22, 2004, and had three physical therapy visits: January 3, 2005, January 10, 2005 and January 13, 2005.
12. Plaintiff sought treatment at WakeMed Faculty Physicians in January 2005. A steroid injection was administered which only provided a couple days of relief. On March 1, 2005, Dr. Terry Messer at WakeMed Faculty Physicians saw Plaintiff and recommended an MRI to rule out a rotator cuff tear. An MRI was performed on Plaintiff's right shoulder on March 7, 2005, and revealed no rotator cuff tear, but did reveal some AC joint arthrosis, which is a form of degenerative arthritis.
13. On April 6, 2005, Dr. Messer saw Plaintiff again. Dr. Messer examined Plaintiff and reviewed her MRI. Dr. Messer diagnosed Plaintiff as having a right shoulder sprain with adhesive capsulitis. Dr. Messer stated that Plaintiff could work, but restricted her from heavy lifting and repetitive overhead lifting. Plaintiff returned to Dr. Messer on May 17, 2005, and June 21, 2005. Due to Plaintiff's ongoing shoulder pain, Dr. Messer referred Plaintiff to Dr. Mark Wood, an orthopaedic surgeon, to determine if she was a candidate for arthroscopic shoulder surgery.
14. Dr. Wood examined Plaintiff on July 25, 2005. He recommended an injection at Plaintiff's right AC joint, but Plaintiff refused the injection. Dr. Wood also recommended an arthrogram to evaluate Plaintiff for a possible intra-articular loose body or labral tear. The arthrogram was subsequently performed and revealed an abnormal labrum and absence of the biceps tendon. Dr. Wood diagnosed Plaintiff as having chronic shoulder pain with a likely SLAP (superior labrum anterior to posterior) tear and AC arthrosis. Dr. Wood performed an arthroscopic procedure to repair Plaintiff's shoulder on November 29, 2005. *Page 7 
15. Dr. Wood testified that his surgical findings consisted of a complete tear of Plaintiff's biceps tendon, a labral tear, arthrosis at her AC joint and partial thickness degenerative changes of one of her rotator cuff tendons.
16. Dr. Wood testified that Plaintiff did quite well after surgery and he released her to return to work with light-duty restrictions on January 20, 2006, for the next two months, followed by a full-duty release with no restrictions. On April 21, 2006, Dr. Wood noted that Plaintiff had returned to work and that she could continue to work at light duty, but limited her to not lifting greater then 10 pounds for one month.
17. Dr. Wood referred Plaintiff for a functional capacity evaluation (FCE), which was performed on May 30, 2006. Dr. Wood testified that he agreed with the results of Plaintiff's FCE, which recommended that she should be restricted to a sedentary type job with no lifting, carrying, pushing or pulling objects weighing more than 10 pounds. In his release note of June 2, 2006, Dr. Wood stated that "[c]urrently she is a nursing assistant, but based on evaluation and the results of the FCE she will not be able to perform this job or any job requiring lifting greater than 10 pounds."
18. Dr. Wood was deposed on September 22, 2006. Dr. Wood testified that Plaintiff reported that her injury was the result of lifting a patient in August 2004; however, he did not know anything about the circumstances surrounding Plaintiff's lifting of the patient.
19. Dr. Wood opined to a reasonable degree of medical certainty and the Full Commission finds as fact, that the conditions for which he treated Plaintiff were directly related to, and caused by her injury on August 23, 2004. Dr. Wood also opined to a reasonable degree of medical certainty and the Full Commission finds as fact, that the surgery he performed, and *Page 8 
the medication and physical therapy he prescribed were reasonably required to provide relief from Plaintiff's symptoms.
20. Dr. Wood believed Plaintiff had suffered some permanent disability but he wanted to re-examine her and his file before assigning a permanent partial impairment rating. Dr. Wood testified that Plaintiff was totally disabled from November 30, 2005 through February 1, 2006, and he was substantially certain that Plaintiff would need further medical treatment in the future.
21. Patty Williams testified that she is a registered nurse and owner of Defendant-Employer. She testified that it was a very common job duty for a CNA to lift a patient out of bed and that a CNA is required to handle patients in different positions. Ms. Williams also testified that she was not notified of Plaintiff's injury until August 29, 2004, and that the date of hearing before the Deputy Commissioner was the first time that she was aware of Plaintiff's claim that she found the patient on the edge of the bed. Ms. Williams testified that Plaintiff continued working for Defendant-Employer until the patient passed away in February 2005. Thereafter, Defendant-Employer notified Plaintiff that it did not have any jobs available to match her skills and abilities. Greater weight is given to Plaintiff's testimony on when she gave notice of her injury to Ms. Williams.
22. After February 2005, Plaintiff collected unemployment benefits for a period of 26 weeks at $160.00 per week for a total of $4,160.00.
23. Plaintiff began working during the summer of 2005, at City Oaks Nursing Home as a CNA. Although Plaintiff worked there for approximately one month, she was unable to continue working because her right shoulder injury prevented her from being able to lift patients. *Page 9 
24. Plaintiff's next employer was Southeastern Wake Adult Day Care from mid-summer of 2005 until August 2005, where she was employed as a CNA caring for a single person. Plaintiff testified that she was able to perform this job because the new patient lived with her daughter, who helped with a lot of the heavier work. In addition, the new patient did not require help getting out of bed. Plaintiff worked for this patient until November 2005, at which time she underwent surgery for repair of her right shoulder.
25. Since November 2005, Plaintiff has not been continuously employed, but has sought employment with nursing homes, fast food establishments and stores located in the mall.
26. Based on the greater weight of the evidence, including Dr. Wood's testimony, Plaintiff's right shoulder condition, which required surgery, was causally related to her injury by accident arising out of and in the course of her employment on August 23, 2004.
27. Plaintiff's disability began from the time of the injury. Although Plaintiff was able to continue her employment with Defendant-Employer after her injury, she was only able to continue to work because the patient's family provided substantial assistance. After the patient died in February 2005, Defendant-Employer did not have any jobs available within Plaintiff's physical limitations resulting from her injury. Despite these physical limitations, Plaintiff made reasonable efforts to find suitable employment after February 2005, when her job ended with Defendant-Employer. The work that Plaintiff performed for two nursing agencies for a short period of time in 2005, is not indicative of wage earning capacity as Plaintiff could not perform the job duty of lifting at one nursing home, and could perform lifting at the second job location only with the assistance of the patient's family. Based on the greater weight of the evidence, Plaintiff was totally disabled from working from November 30, 2005, when she underwent surgery, through February 1, 2006. *Page 10 
28. Although Dr. Wood released Plaintiff to return to work after February 1, 2006, he was of the opinion that Plaintiff was physically incapable of returning to work as a CNA or in any employment requiring her to lift greater than 10 pounds. After February 1, 2006, Plaintiff looked for jobs primarily in the CNA line of work because "taking care of people" was the only type of work she knew she was trained to do. Plaintiff continued to search unsuccessfully for employment through the date of hearing before the Deputy Commissioner. She had also enrolled in a program to obtain her General Equivalency Diploma (GED). Based on the greater weight of the evidence, Plaintiff has made reasonable efforts to find suitable employment since her release to return to work on February 1, 2006.
29. The parties stipulated that Plaintiff's average weekly wage on August 23, 2004 was $302.75, resulting in a compensation rate of $201.84.
30. The medical treatment Plaintiff received for her compensable injury by accident was reasonably required to effect a cure, provide relief, or to lessen her disability.
31. Defendants are entitled to a credit of $4,160.00, for unemployment benefits Plaintiff received over a period of 26 weeks in 2005.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to her right shoulder on August 23, 2004, arising out of and in the course of her employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6). *Page 11 
2. An accident is "an unlooked for and untoward event which is not expected or designed by the person who suffers the injury." Adams v.Burlington Industries, Inc., 61 N.C. App. 258, 260, 300 S.E.2d 455, 456
(1983) (citation omitted). "The elements of an' accident' are the interruption of the routine of work and the introduction thereby of unusual conditions likely to result in unexpected consequences."Id. (citation omitted).
3. In the instant case, on August 23, 2004, Plaintiff arrived at work to find the patient positioned on the edge of the bed, which was unusual, as the patient was usually positioned in the middle of the bed. Because the patient was on the edge of the bed, rather than the middle, when Plaintiff turned the patient to a position across the bed and began to place her feet on the floor, the patient's body began to unexpectedly slide down to the floor. Plaintiff's injury occurred when she maneuvered to keep the Patient from falling to the floor. When the patient began to unexpectedly slide off the bed to the floor causing more of the patient's weight to have to be supported by Plaintiff, this incident constituted an interruption of Plaintiff's normal work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. Plaintiff's resulting injury to her shoulder constituted an injury by accident arising out of and in the course of her employment. N.C. Gen. Stat. § 97-2(6). See Adams, 61 N.C. App. 258, 260,300 S.E.2d 455, 456
4. A Plaintiff in a workers' compensation case has the burden of initially proving "each and every element of compensability," including a causal relationship between the injury and the employment. Whitfield v.Lab. Corp. of Amer., 158 N.C. App. 341, 350, 581 S.E.2d 778, 784
(2003). "The quantum and quality of the evidence required to establish prima facie the causal relationship will of course vary with the complexity of the injury itself." Hodgin v. Hodgin, 159 N.C. App. 635,639, 583 S.E.2d 362, 365 (2003). A Plaintiff must prove causation *Page 12 
by the "greater weight" of the evidence. Phillips v. U.S. Air, Inc.,120 N.C. App. 538, 541, 463 S.E.2d 259, 261 (1995). The Supreme Court of North Carolina has also held that in cases involving complicated medical questions, only an expert can give competent opinion testimony as to the issue of causation. Click v. Pilot Freight Carriers, 300 N.C. 164,167, 265 S.E.2d 389, 391 (1980). Where medical opinion testimony is required, "medical certainty is not required, [but] an expert's `speculation' is insufficient to establish causation." Holley v. ACTS,Inc., 357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003). Furthermore, the causal relationship must be established by evidence "such as to take the case out of the realm of conjecture and remote possibility." Holley,357 N.C. at 232, 581 S.E.2d at 753. In the instant case, Dr. Wood's opinion testimony causally relates, to a reasonable degree of medical certainty, Plaintiff's right shoulder injury to her accident that occurred at work on August 23, 2004. Plaintiff has met her burden of proof on the issue of causation.
5. "Proffered employment would not accurately reflect earning capacity if other employers would not hire the employee with the employee's limitations at a comparable wage level." Peoples v. Cone Mills Corp.,316 N.C. 426, 438, 342 S.E.2d 798, 806 (1986). Work that has been so modified to meet an employee's workplace restrictions as a result of an injury is not indicative of the employee's ability to earn the same wages in a competitive job market at a comparable wage. Saums v. RaleighCommunity Hospital, 346 N.C. 760, 765, 487 S.E.2d 746, 750 (1997).
6. "The burden is on the employee to show that he is unable to earn the same wages he earned before the injury, either in the same employment or in other employment. The employee may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in *Page 13 
any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on her part, been unsuccessful in her effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury." Russell v. Lowes Product Distribution,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
7. In the instant case, Plaintiff's disability began August 23, 2004. Although Plaintiff was able to continue her employment with Defendant-Employer, she was only able to perform her duties due to the substantial assistance provided by the patient's family. After the patient died in February 2005, Defendant-Employer did not have any jobs available within Plaintiff's restrictions. Plaintiff made reasonable efforts to find suitable employment after February 2005, when her job ended with Defendant-Employer. The work that Plaintiff performed for two nursing agencies for a short period of time in 2005, is not indicative of wage earning capacity as Plaintiff could not perform the job duty of lifting at one nursing home, and could perform lifting at the second job location only with the assistance of the patient's family. Based on the greater weight of the evidence, Plaintiff was totally disabled from working from November 30, 2005 through February 1, 2006. Additionally, although Dr. Wood released Plaintiff to return to work after February 1, 2006, he was of the opinion that Plaintiff was physically incapable of returning to work as a CNA or to any employment requiring her to lift greater than 10 pounds. After February 1, 2006, Plaintiff looked for jobs primarily in the same line of work because "taking care of people" was the only type of work she knew she was trained to do. Plaintiff continued to search unsuccessfully for employment through the date of hearing *Page 14 
before the Deputy Commissioner. She had also enrolled in a program to obtain her General Equivalency Diploma (GED). Based on the greater weight of the evidence, Plaintiff has made reasonable efforts to find suitable employment since her release to return to work on February 1, 2006.
8. The parties stipulated that Plaintiff's average weekly wage on August 23, 2004 was $302.75, resulting in a compensation rate of $201.84. N.C. Gen. Stat. § 97-2(5).
9. Plaintiff is entitled to temporary total disability compensation from February 2005 and continuing until further Order of the Commission. Defendants are entitled to a credit for wages Plaintiff earned after February 2005 when her job ended with Defendant-Employer and for the unemployment compensation benefits Plaintiff received during the relevant time periods. N.C. Gen. Stat. §§ 97-42 and 97-42.1.
10. Plaintiff is entitled to payment of past and future medical expenses incurred or to be incurred as a result of her compensable injury for so long as such treatment may reasonably be required to effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney fees hereinafter approved, Defendants shall pay to Plaintiff temporary total disability compensation at the rate of $201.83 per week from the time she last worked for Defendant-Employer in February 2005 through the date of hearing before the Deputy Commissioner, and continuing until further Order of the Commission. Defendants are entitled to *Page 15 
a credit for wages Plaintiff earned after February 2005 and for the unemployment compensation benefits Plaintiff received in 2005. All compensation that has accrued shall be paid in a lump sum.
2. Defendants shall pay all past and future medical expenses incurred or to be incurred by Plaintiff as a result of her compensable injury in accordance with procedures adopted by the Commission.
3. Reasonable attorney fees of 25% of the compensation due Plaintiff is approved for Plaintiff's counsel, and shall be paid as follows: 25% of the lump sum due Plaintiff shall be deducted and paid directly to Plaintiff's attorney; thereafter, Defendants are to deduct and pay every fourth check due Plaintiff directly to Plaintiff's counsel.
4. Defendants shall pay the costs.
This the ___ day of September 2007.
 S/______________________
 BERNADINE S. BALANCE
 COMMISSIONER
CONCURRING:
S/______________________
PAMELA T. YOUNG COMMISSIONER
S/______________________ DANNY LEE McDONALD COMMISSIONER